ANDREW L. PACKARD (State Bar No. 168690)
JOHN J. PRAGER (State Bar No. 289610)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, | Case No. |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| vs. | |
| S. MARTINELLI & CO., | (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |
| Defendant. | |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its counsel, hereby alleges:

I.    **JURISDICTION AND VENUE**

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, *et seq*. (the "Clean Water Act" or "the Act") against S. MARTINELLI & CO. (hereafter "Defendant"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. § 2201-02 (power to issue declaratory relief in case of actual controversy and

further necessary relief based on such a declaration), 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. § 1319(d), 1365(a) (civil penalties).

2.    On or about April 2, 2014, Plaintiff provided notice of Defendant's violations of the Act ("CWA Notice Letter"), and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CSPA's CWA Notice Letter is attached hereto as Exhibit A, and is incorporated by reference.

3.    More than sixty days have passed since this CWA Notice Letter was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.    Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.  Pursuant to Local Rule 3-2(e), intra-district venue is proper in San Jose, California because the sources of the violations are located within Santa Cruz County.

## II.    **INTRODUCTION**

5.    This Complaint seeks relief for Defendant's discharges of pollutants from an approximately 17-acre food product manufacturing and bottling facility owned and operated by Defendant (the "Facility").  The Facility is located at 735 West Beach Street, in Watsonville, California.  Defendant discharges pollutant-contaminated storm water from the Facility into Watsonville Slough, the Pajaro River and ultimately into Monterey Bay.

6.    Defendant's discharge of pollutant-contaminated storm water from the

COMPLAINT

Facility is in violation of the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit"). Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

7.      The failure on the part of industrial facility operators such as Defendant to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of these receiving waters.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to Watsonville Slough, the Pajaro River and Monterey Bay.

## III.    PARTIES

8.      Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California.  CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including Watsonville Slough, the Pajaro River and Monterey Bay.  CSPA is dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California.  To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

9.      Members of CSPA reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CSPA use and enjoy the waters of Watsonville Slough, the Pajaro River and/or Monterey Bay, into which Defendant

COMPLAINT

has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of CSPA use these areas to fish, sail, boat, kayak, swim, birdwatch, view wildlife and engage in scientific study, including monitoring activities, among other things.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

10.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

11.     Plaintiff is informed and believes, and thereupon alleges that Defendant is a city organized under the laws of the State of California, and that Defendant owns and operates the Facility.

## IV.    STATUTORY BACKGROUND

12.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

13.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. §1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342.

14.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including

COMPLAINT

general NPDES permits in California.

15.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

16.     The General Permit contains certain absolute prohibitions.  Discharge Prohibition A(1) of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

17.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires existing dischargers to file their NOIs before March 30, 1992.

18.     Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in its storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.

COMPLAINT

General Permit, Section A(8).

19.    EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendant: total suspended solids (100 mg/L); chemical oxygen demand (120 mg/L); biological oxygen demand (30 mg/L); oil & grease (15 mg/L) .  The State Water Quality Control Board has proposed adding a benchmark level for specific conductance of 200 µmhos/cm.

20.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") before October 1, 1992.  The SWPPP must comply with the BAT and BCT standards.  (Section B(3)).  The SWPPP must include, among other elements: (1) a narrative description and summary of all industrial activity, potential sources of pollutants and potential pollutants; (2) a site map showing facility boundaries, the storm water conveyance system, associated points of discharge, direction of flow, areas of industrial activities, and areas of actual and potential pollutant contact; (3) a description of storm water management practices, best management practices ("BMPs") and preventive maintenance undertaken to avoid storm water contamination that achieve BAT and BCT; (4) the location where Significant Materials are being shipped, stored, received and handled, as well as the typical quantities of such materials and the frequency with which they are handled; (5) a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities; (6) a summary of storm water sampling points; (7) a description of individuals and their responsibilities for developing and implementing the SWPPP (Permit, Section A(3)); (8) a description of potential pollutant sources including industrial processes, material handling and storage areas, and dust and particulate generating activities; (9) a description of significant spills and leaks; (10) a list of all non-storm water discharges and their sources, and (11) a description of locations where soil erosion may occur (Section A(6)).  The SWPPP must also include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be

COMPLAINT

implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)).

21.     The SWPPP must be re-evaluated annually to ensure effectiveness and must be revised where necessary (Section A(9),(10)).  Section  C(3) of the General Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60 days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Section C(4)(a).  Section C(11)(d) of the General Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Section E(6).  Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

22.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the General Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

23.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written Monitoring and Reporting Program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

24.     The General Permit also requires dischargers to submit yearly "Annual Reports" to the Regional Board.  As part of their monitoring program, dischargers must

identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented. Dischargers must then conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS"), specific conductance ("SC"), and total organic carbon ("TOC") or oil and grease ("O&G"), certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.  The monitoring and reporting program requires dischargers to certify, based upon the annual site inspections, that the facility is in compliance with the General Permit and report any non-compliance, and contains additional requirements as well.

25.    In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

26.    The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

27.    A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

28.    "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  Waters of the United States include tributaries to waters that are navigable in fact.  Waters of the United States include man-made water bodies that are tributary to waters

COMPLAINT

that are navigable in fact.  Waters of the United States include ephemeral waters that are tributary to waters that are navigable in fact.

29.      Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

30.      The Regional Board has established water quality standards for Watsonville Slough, the Pajaro River and Monterey Bay in the Water Quality Control Plan for the Central Coast Basin, generally referred to as the "Basin Plan."

31.      The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to or which produce detrimental physiological responses in, human, plant, animal, or aquatic life."

32.      The Basin Plan provides that "[w]aters shall not contain concentrations of chemical constituents known to be deleterious to fish or wildlife."

33.      The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."

V.      **STATEMENT OF FACTS**

34.      The Facility is classified as conforming to Standard Industrial Classification ("SIC") Codes 2099 ("Food Preparations").  Industrial activities occur throughout the Facility.

35.      CSPA notes that Martinelli has reported in publicly available documents that industrial activities at the 17-acre Facility include manufacturing and bottling food products, as well as storing vehicles, scrap metal materials, and petroleum products. Most of these activities occur

COMPLAINT

outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms and other storm water controls. Plaintiff is informed and believes that Defendant's storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

36. The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards. The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants, thereby allowing storm water to flow over and across these materials and become contaminated prior to leaving the Facility. In addition, the Facility lacks structural controls to prevent the discharge of water once contaminated. The Facility also lacks an adequate filtration system to treat water once it is contaminated.

37. Vehicle traffic at the Facility tracks dust and particulate matter, increasing the discharges of polluted water and mud into waters of the United States.

38. During rain events storm water laden with pollutants discharges from the Facility to , the Pajaro River and ultimately into Monterey Bay.

39. Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during significant rain events.

40. Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.

41. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

42. Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

COMPLAINT

43.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has not sampled with adequate frequency, has not conducted visual monitoring, and has not analyzed the storm water samples collected at the Facility for the required pollutant parameters.

44.     Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## V.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water From The Facility
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

45.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

46.     Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

47.     Plaintiff is informed and believes, and thereupon alleges, that since at least October 1, 1992, Defendant has been discharging polluted storm water from the Facility into Watsonville Slough, the Pajaro River and Monterey Bay in violation of the General Permit.

48.     During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility to Watsonville Slough, the Pajaro River and Monterey Bay.

49.     Plaintiff is informed and believes, and thereupon alleges, that these discharges

COMPLAINT

of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

50.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

51.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

52.     Plaintiff is informed and believes, and thereupon alleges, that every significant rain event since June 3, 2009 Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit.  Every day Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### SECOND CAUSE OF ACTION
**Failure to Develop and Implement an Adequate
Storm Water Pollution Prevention Plan For the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

53.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

54.     Section A and Provision E of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate Storm Water Pollution Prevention Plan ("SWPPP") no later than October 1, 1992.

55.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's outdoor storage of industrial materials without appropriate best management practices; the continued exposure of significant quantities of

COMPLAINT

industrial material to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

56.     Defendant has further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit.

57.     Each day since June 3, 2009 that Defendant has failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

58.     Defendant has been in violation of the SWPPP requirement every day since June 3, 2009.  Defendant continues to be in violation of the Act each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Failure to Develop and Implement the Best Available
And Best Conventional Treatment Technologies At The Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

59.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

60.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

61.     Defendant has failed to implement BAT and BCT at the Facility for their discharges of total suspended solids, Oil & Grease, specific conductance, and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

62.     Each day that Defendant has failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

COMPLAINT

63.     Defendant has been in violation of the BAT and BCT requirements at the Facility every day since at least June 3, 2009.  Defendant continues to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

**FOURTH CAUSE OF ACTION**
**Failure to Develop and Implement an Adequate**
**Monitoring and Reporting Program For The Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

64.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

65.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement a monitoring and reporting program (including, among other things, sampling and analysis of discharges) no later than October 1, 1992.

66.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendant's ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their continuing failure to collect and analyze storm water samples from all discharge locations, their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities, and their failure to file required Annual Reports with the Regional Board which provide required documentation and information relating to visual observations and storm water sampling and analysis conducted at the Facility.

67.     Each day since June 3, 2009 that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

COMPLAINT
14

VI.   **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act, as alleged herein;

b.   Enjoin Defendant from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendant to pay civil penalties of $37,500 per day per violation, for each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1 - 19.4 (pp. 200-202) (Dec. 31, 1996);

e.   Order Defendant to take appropriate actions to restore the quality of navigable waters impaired by their activities;

f.   Award Plaintiff's costs (including reasonable attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

g.   Award any such other and further relief as this Court may deem appropriate.

Dated: June 3, 2014          Respectfully Submitted,

LAW OFFICES OF ANDREW L. PACKARD

By:    _/s/ Andrew L. Packard _____

Andrew L. Packard
Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

COMPLAINT

**EXHIBIT A**



April 2, 2014

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

Miguel Contreras, E.H. & Safety           S. John Martinelli, Agent for Process
Supervisor                                 S. Martinelli & Co.
S. Martinelli & Co                         P.O. Box 1868
227 E. Beach St.                           Watsonville, CA 95077
Watsonville, CA 95077

Miguel Contreras, E.H. & Safety
Supervisor
S. Martinelli & Co.
735 W. Beach Street
Watsonville, CA 95077

**Re:    Notice of Violations and Intent to File Suit Under the Federal Water
        Pollution Control Act**

Dear Messrs. Martinelli and Contreras:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at S. Martinelli & Co.'s bottling facility located at 735 West Beach Street, in Watsonville, California ("the Facility"). The WDID number for the Facility is 3 44S011445. CSPA is a non-profit public benefit corporation dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters and the Pacific Ocean. This letter is being sent to you as the responsible owner, officer, or operator of the Facility. Unless otherwise noted, Miguel Contreras, S. John Martinelli, and S. Martinelli & Co. shall hereinafter be collectively referred to as "Martinelli."

This letter addresses Martinelli's unlawful discharges of pollutants from the Facility to the City of Watsonville municipal storm drain system, the Watsonville Slough, the Pajaro River and ultimately to the Pacific Ocean. This letter addresses the ongoing

violations of the substantive and procedural requirements of the Clean Water Act and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Miguel Contreras, S. John Martinelli, and S. Martinelli & Co. are hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against Miguel Contreras, S. John Martinelli, and S. Martinelli & Co. under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit. These violations are described more fully below.

## I.    Background.

The Facility is located at 735 West Beach Street in the city of Watsonville. The Facility falls under Standard Industrial Classification ("SIC") Code 2099 ("Food Preparations"). CSPA notes that Martinelli has reported in publicly available documents that industrial activities at the 17-acre Facility include manufacturing and bottling food products, as well as storing vehicles, scrap metal materials, and petroleum products. Martinelli collects and discharges storm water from the Facility through at least three (3) discharge points into the City of Watsonville municipal storm drain system, Watsonville Slough, the Pajaro River, and ultimately into the Pacific Ocean. Watsonville Slough, the Pajaro River and the Pacific Ocean are waters of the United States within the meaning of the Clean Water Act.

The Central Coast Regional Water Quality Control Board ("Regional Board") has established water quality standards for Watsonville Slough, the Pajaro River, and the Pacific Ocean in the "Water Quality Control Plan for the Central Coast Basin" ("Basin Plan"). The Basin Plan incorporates in its entirety the State Board's "Water Quality Control Plan for Ocean Waters of California" ("Ocean Plan"). The Ocean Plan "sets forth limits or levels of water quality characteristics for ocean waters to ensure the reasonable protection of beneficial uses and the prevention of nuisance. The discharge of waste shall not cause violation of these objectives." *Id*. at 4. The Ocean Plan limits the concentration of organic materials in marine sediment to levels that would not degrade marine life. *Id*. at 6. The Basin Plan establishes ocean water quality objectives,

Notice of Violation and Intent To File Suit
April 2, 2014
Page 3 of 16

including that dissolved oxygen is not to be less than 7.0 mg/l and pH must be between 7.0 - 8.5 s.u.  *Id*. at III-2.  It also establishes that toxic metal concentrations in marine habitats shall not exceed:  Cu – 0.01 mg/L; Pb – 0.01 mg/L; Hg – 0.0001 mg/L; Ni – 0.002 mg/L; and, Zn – 0.02 mg/L.  *Id.* at III-12.

The Basin Plan provides maximum contaminant levels ("MCLs") for organic concentrations and inorganic and fluoride concentrations, not to be exceeded in domestic or municipal supply.  *Id*. at III-6 - III-7.  It requires that water designated for use as domestic or municipal supply shall not exceed the following maximum contaminant levels: aluminum – 1.0 mg/L; arsenic - 0.05 mg/L; lead - 0.05 mg/L; and mercury - 0.002 mg/L.  *Id*. at III-7.  The EPA has also issued recommended water quality criterion MCLs, or Treatment Techniques, for mercury - 0.002 mg/L; lead – 0.015 mg/L; chromium – 0.1 mg/L; and, copper – 1.3 mg/L.  The EPA has also issued a recommended water quality criterion for aluminum for freshwater aquatic life protection of 0.087 mg/L.  In addition, the EPA has established a secondary MCL, consumer acceptance limit for aluminum - 0.05 mg/L to 0.2 mg/L, and for zinc - 5.0 mg/L.  *See* http://www.epa.gov/safewater/ mcl.html.  Finally, the California Department of Health Services has established the following MCL, consumer acceptance levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 mg/L (secondary); iron – 0.3 mg/L; and zinc – 5.0 mg/L.  *See* California Code of Regulations, title 22, §§ 64431, 64449.

The California Toxics Rule ("CTR"), issued by the EPA in 2000, establishes numeric receiving water limits for certain toxic pollutants in California surface waters. 40 C.F.R. § 131.38**.**  The CTR establishes the following numeric limits for freshwater surface waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

The Regional Board has identified waters of the Central Coast as failing to meet water quality standards for pollutant/stressors such as unknown toxicity, numerous pesticides, and mercury.[1]  Discharges of listed pollutants into an impaired surface water may be deemed a "contribution" to an exceedance of the CTR, a water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the General Industrial Storm Water Permit was "subject to effluent limitations as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

---

[1] *See* http://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/category5_report .shtml.

The General Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Martinelli: oil & grease – 15 mg/L; and total suspended solids – 100.0 mg/L. The State Water Quality Control Board has also proposed adding a benchmark level for specific conductance of 200 µmhos/cm. . Additional EPA benchmark levels have been established for other parameters that CSPA believes are being discharged from the Facility, including but not limited to: pH – 6.0 – 9.0 s.u.; total organic carbon – 110 mg/L; and zinc – 0.117 mg/L.

## II.     Martinelli Is Violating the Act by Discharging Pollutants From the Facility to Waters of the United States.

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges. *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutants by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements. 33 U.S.C. § 1311(a). The duty to apply for a permit extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6). A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). An industrial facility that discharges pollutants into a navigable water is subject to regulation as a "point source" under the Clean Water Act. *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993). "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7). Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States. *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

Watsonville Slough, the Pajaro River, and the Pacific Ocean are waters of the United States. Accordingly, Martinelli's discharges of storm water containing pollutants from the Facility are discharges to waters of the United States.

CSPA is informed and believes, and thereupon alleges, that Martinelli has discharged, and continues to discharge, pollutants from the Facility to waters of the United States every day that there has been or will be any measurable discharge of storm

water from the Facility since May 12, 1997.  Each discharge on each separate day is a separate violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These unlawful discharges are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Martinelli is subject to penalties for violations of the Act since April 2, 2009.


### III.     Pollutant Discharges in Violation of the NPDES Permit.

Martinelli has violated and continues to violate the terms and conditions of the General Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit.  33 U.S.C. § 1342.  The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, Oil & Grease ("O&G"), pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the General Permit provides:  "Except as allowed in Special Conditions (D.1.) of this General Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the General Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Based on its review of available public documents, CSPA is informed and believes: (1) that Martinelli continues to discharge pollutants in excess of benchmarks and (2) that Martinelli has failed to implement BMPs adequate to bring its discharge of these and other pollutants in compliance with the General Permit.  Martinelli's ongoing violations are discussed further below.

Notice of Violation and Intent To File Suit
April 2, 2014
Page 6 of 16

**A.      Martinelli Has Discharged Storm Water Containing Pollutants in Violation of the Permit.**

Martinelli has discharged and continues to discharge storm water with unacceptable levels of Total Suspended Solids (TSS), Oil and Grease (O&G) and Specific Conductance (SC) in violation of the General Permit.  These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A.  Martinelli's Annual Reports and Sampling and Analysis Results confirm discharges of materials other than storm water and specific pollutants in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

**1.      Discharge of Storm Water Containing Oil & Grease (O&G) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 2/29/2012 | Discharge Point 1 | O&G | 35 mg/l | 15 mg/l |
| 2/29/2012 | Discharge Point 3 | O&G | 18 mg/l | 15 mg/l |
| 4/13/2012 | Discharge Point 1 | O&G | 30 mg/l | 15 mg/l |
| 4/13/2012 | Discharge Point 2 | O&G | 30 mg/l | 15 mg/l |
| 4/13/2012 | Discharge Point 3 | O&G | 29 mg/l | 15 mg/l |
| 1/25/2013 | Discharge Point 1 | O&G | 20 mg/l | 15 mg/l |
| 1/25/2013 | Discharge Point 2 | O&G | 20 mg/l | 15 mg/l |
| 1/25/2013 | Discharge Point 3 | O&G | 26 mg/l | 15 mg/l |
| 2/19/2013 | Discharge Point 3 | O&G | 120 mg/l | 15 mg/l |

2.   **Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 10/13/2009 | Discharge 1 | TSS | 130 mg/l | 100 mg/l |
| 10/13/2009 | Discharge 2 | TSS | 190 mg/l | 100 mg/l |
| 10/13/2009 | Discharge 3 | TSS | 370 mg/l | 100 mg/l |
| 4/13/2012 | Discharge 1 | TSS | 220 mg/l | 100 mg/l |
| 4/13/2012 | Discharge 3 | TSS | 240 mg/l | 100 mg/l |
| 2/19/2013 | Discharge 2 | TSS | 120 mg/l | 100 mg/l |

3.   **Discharge of Storm Water Containing Specific Conductance (SC) at Concentration in Excess of Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 1/25/2013 | Discharge Point 2 | SC | 220 µmhos/cm | 200 µmhos/cm |
| 1/25/2013 | Discharge Point 3 | SC | 270 µmhos/cm | 200 µmhos/cm |

CSPA's investigation, including its review of Martinelli's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark values and the State Board's proposed benchmark levels for specific conductivity, indicates that Martinelli has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids (TSS), Oil and Grease, and Specific Conductance (SC), in violation of Effluent Limitation B(3) of the General Permit. Martinelli was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations. Thus, Martinelli is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

CSPA is informed and believes that Martinelli has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least April 2, 2009. CSPA alleges that such violations also have occurred and

Notice of Violation and Intent To File Suit
April 2, 2014
Page 8 of 16

will occur on other rain dates, including during every single significant rain event that has occurred since April 2, 2009, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Martinelli has discharged storm water containing impermissible levels of Total Suspended Solids (TSS), and Oil and Grease (O&G) and Specific Conductance (SC) in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the General Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Martinelli is subject to penalties for violations of the General Permit and the Act since April 2, 2009.

**B.      Martinelli Has Failed to Implement an Adequate Monitoring & Reporting Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Plan by no later than October 1, 1992 or the start of operations. Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board. Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled." Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon. Oil and grease may be substituted for total organic carbon. Section B(5)(c)(ii) of the General Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." Section B(10) of the General Permit provides that "Facility operators shall explain how the Facility's monitoring program will satisfy the monitoring program objectives of [General Permit] Section B.2."

Based on its investigation, CSPA is informed and believes that Martinelli has failed to develop and implement an adequate Monitoring & Reporting Plan. First, based on its review of publicly available documents, CSPA is informed and believes that Martinelli has failed to collect storm water samples during at least two qualifying storms events, as defined by the General Permit, during at the past five Wet Seasons. Second, based on its review of publicly available documents, CSPA is informed and believes that Martinelli has failed to conduct the monthly visual monitoring of storm water discharges and the quarterly visual observations of unauthorized non-storm water discharges required under the General Permit during at least four of the past five Wet Seasons. Third, based on its review of publicly available documents, CSPA is informed and

Notice of Violation and Intent To File Suit
April 2, 2014
Page 9 of 16

believes that for the past five Wet Seasons, Martinelli has failed to analyze samples for
other pollutants that are likely to be present in significant quantities in the storm water
discharged from the Facility, including lead.  Lastly, while Martinelli asserts that the
Facility has six (6) discharge points in the Annual Reports, it appears the Facility has
consistently sampled from only three discharge points.

Each of these failures constitutes a separate and ongoing violation of the General
Permit and the Act.  Consistent with the five-year statute of limitations applicable to
citizen enforcement actions brought pursuant to the federal Clean Water Act, Martinelli is
subject to penalties for violations of the General Permit and the Act since April 2, 2009.
These violations are set forth in greater detail below:

**1.     Martinelli Has Failed to Collect Storm Water Samples During
at Least Two Rain Events In Each of the Last Five Wet
Seasons.**

Based on its review of publicly available documents, CSPA is informed and
believes that Martinelli has failed to collect storm water samples from all discharge
points during at least two qualifying rain events at the Facility during each of the past five
Wet Seasons, as required by the General Permit.  For example, CSPA notes that the
Annual Report filed by Martinelli for the Facility for the 2008-2009 Wet Season reported
that Martinelli analyzed samples of storm water discharged during two qualifying storm
events that season.  However, upon closer scrutiny it turns out that one of the samples
was not taken during a qualifying storm events within the meaning of the General Permit
(discussed further below).  Similarly, in the 2009-2010 Annual Report, Martinelli
sampled from another storm event that was not a qualifying storm event.  Furthermore, in
each of the 2011-2012, and 2012-2013, Annual Reports, Martinelli failed to sample from
two qualifying storm events for those seasons, as required by the General Permit.

Martinelli reported in its Annual Reports for the 2011-2012 and 2012-2013 Wet
Seasons that the Facility sampled the first qualifying storm event of the season, when in
fact it did not sample the first storm of the season during those two Wet Seasons.  For
example, Martinelli reported in its 2011-2012 Annual Report that it sampled the first
qualifying storm event of the Wet Season, but Martinelli's first sample is from February
29, 2012.  Based upon its review of publicly available rainfall data, CSPA is informed
and believes that the first qualifying storm event of the 2011-2012 Wet Season occurred
as early as Monday, October 3, 2011, when 0.47" of rain fell on the Facility.  This failure
to adequately monitor storm water discharges constitutes separate and ongoing violations
of the General Permit and the Act.

These failures to adequately monitor storm water discharges constitute separate
and ongoing violations of the General Permit and the Act.

### 2. Martinelli Has Failed to Conduct the Monthly Wet Season Observations of Storm Water Discharges Required by the General Permit.

The General Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)." General Permit, Section B(4)(a). As evidenced by the entries on Form 4 Monthly Visual Observations contained in Martinelli's annual reports for four of the last five Wet Seasons, CSPA is informed and believes that Martinelli has failed to comply with this requirement of the General Permit.

Specifically, Martinelli failed to conduct monthly visual observations of discharges from qualifying storm events for most months during at least four of the past five Wet Seasons. Instead, Martinelli either completely failed to document visual observations at all or documented its visual observations of storm water that discharged during non-qualifying storm events, for most months during the entire Wet Season of four of the past five years (discussed further below). However, based on publicly available rainfall data, CSPA is informed and believes that there were many qualifying storm events during each of these Wet Seasons that Martinelli could have observed.

For example, Martinelli reported in its 2010-2011 Annual Report that it observed a qualifying storm event on Monday, October 25, 2010. However, CSPA is informed and believes that this could not possibly be true because no rain fell on the Facility on that day. Further, Martinelli reported in its 2009-2010 Annual Report that it conducted observations for all the months during the Wet Season, but upon review of the Annual Report, it is clear that Martinelli failed to conduct any monitoring whatsoever despite the fact that there were many qualifying storm events during which to conduct visual observations. Martinelli's failure to conduct this required monthly Wet Season visual monitoring extends back to at least April 2, 2009. Martinelli's failure to conduct this required monthly Wet Season visual monitoring has caused and continues to cause multiple, separate and ongoing violations of the General Permit and the Act.

### 3. Martinelli Is Subject to Penalties for Its Failure to Implement an Adequate Monitoring & Reporting Plan Since April 2, 2009.

CSPA is informed and believes that publicly available documents demonstrate Martinelli's consistent and ongoing failure to implement an adequate Monitoring Reporting Plan in violation of Section B of the General Permit. For example, while in its 2010-2011 Annual Report Martinelli reported having collected samples of storm water discharged during two qualifying storm events, neither of the two storm events sampled was a qualifying storm event within the meaning of the General Permit. Based on its review of publicly available rainfall data, CSPA is informed and believes that the storm that occurred at the Facility on November 23, 2010 was not a qualifying storm event. Specifically, Martinelli sampled a rain event on November 23, 2010 that produced 0.43" of rainfall on the Facility. However, two days prior, on November 21, 2010, 0.15" of rain

fell on the Facility.  Thus, the November 21st storm event rendered any storm occurring for three days afterwards a non-qualifying storm event. Similarly, Martinelli sampled a rain event on February 17, 2011 that produced .71" of rainfall on the Facility.  However, one day prior, on February 16, 2010, 0.53" of rain fell on the Facility. Thus, the February 16th storm event rendered any storm occurring for three days afterwards a non-qualifying storm event.   Therefore, Martinelli failed to implement an adequate Monitoring Reporting Plan.

Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, the City of Watsonville is subject to penalties for these violations of the General Permit and the Act since April 2, 2009.

**C.     Martinelli Has Failed to Implement BAT and BCT**.

Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  CSPA's investigation indicates that Martinelli has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids (TSS), Oil and Grease (O&G) and Specific Conductance (SC) and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

To meet the BAT/BCT requirement of the General Permit, Martinelli must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility.  Based on the limited information available regarding the internal structure of the Facility, CSPA believes that at a minimum Martinelli must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether.  Martinelli has failed to adequately implement such measures.

Martinelli was required to have implemented BAT and BCT by no later than October 1, 1992.  Therefore, Martinelli has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that it fails to implement BAT and BCT.  Martinelli is subject to penalties for violations of the General Permit and the Act occurring since April 2, 2009.

**D.     Martinelli Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the General Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an

adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the Facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the Facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).  Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's investigation and review of publicly available documents regarding conditions at the Facility indicate that Martinelli has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above.  Martinelli has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary.  Accordingly, Martinelli has been in continuous violation of Section A(1) and Provision E(2) of the General Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP.

Martinelli is subject to penalties for violations of the General Permit and the Act occurring since April 2, 2009.

      **E.**      **Martinelli Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.

The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Martinelli is discharging elevated levels of Total Suspended Solids (TSS), Oil and Grease (O&G) and Specific Conductance (SC) and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards. For each of these pollutant exceedances, Martinelli was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Martinelli was aware of high levels of these pollutants prior to April 2, 2009. Likewise, Martinelli has generally failed to file reports describing its non-compliance with the General Permit in violation of Section C(11)(d). Martinelli has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Permit every day since April 2, 2009, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. Martinelli is subject to penalties for violations of the General Permit and the Act occurring since April 2, 2009.

      **F.**      **Martinelli Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer.

Notice of Violation and Intent To File Suit
April 2, 2014
Page 14 of 16

General Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit
requires the discharger to include in their annual report an evaluation of their storm water
controls, including certifying compliance with the General Industrial Storm Water
Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that Martinelli has submitted incomplete Annual
Reports and purported to comply with the General Permit despite significant
noncompliance at the Facility.  For example, Martinelli reported in two Annual Reports
filed for the past five Wet Seasons (i.e., 2011-2012 and 2012-2013) that it observed storm
water discharges occurring during the first storm of those Wet Seasons.  However, as
discussed above, based on CSPA's review of publicly available rainfall data, CSPA
believes this cannot possibly be true.

Further, Martinelli failed to sample from qualifying storm events in six out of ten
storm water samples collected during the last four Wet Seasons.  For example, in 2010-
2011, Martinelli sampled from a storm event on December 16, 2010 that was not a
qualifying storm event.  Further, in the 2011-2012 Annual Report, Martinelli reported
that it sampled a qualifying storm event on February 29, 2012.  Based on its review of
publicly available rainfall data, CSPA is informed and believes that the storm that
occurred at the Facility on February 29, 2012 was not a qualifying storm event because it
was not the first qualifying storm of the 2011-2012 Wet Season.

Further, Martinelli failed to comply with the monthly visual observations of storm
water discharges requirement for four of the past five Annual Reports filed for the
Facility.  In the 2009-2010 Annual Report, Martinelli did not observe a single qualifying
storm event within the meaning of the General Permit.  Moreover In the 2012-2013
Annual Report, Martinelli reported that it observed discharge from a qualifying storm
event on October 10, 2012.  However, based on publicly available rainfall data, CSPA is
informed and believes that this cannot possibly be true because only 0.02 inches of rain
fell on the Facility on that day.

These are only a few examples of how Martinelli has failed to file completely true
and accurate reports.  As indicated above, Martinelli has failed to comply with the Permit
and the Act consistently for at least the past five years; therefore, Martinelli has violated
Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time Martinelli submitted an
incomplete or incorrect annual report that falsely certified compliance with the Act in the
past five years.  Martinelli's failure to submit true and complete reports constitutes
continuous and ongoing violations of the Permit and the Act.  Martinelli is subject to
penalties for violations of Section (C) of the General Permit and the Act occurring since
April 2, 2009.


**IV.      Persons Responsible for the Violations.**

CSPA puts Miguel Contreras, S. John Martinelli, and S. Martinelli & Co. on

Notice of Violation and Intent To File Suit
April 2, 2014
Page 15 of 16

notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Miguel Contreras, S. John Martinelli, and S. Martinelli & Co. on formal notice that it intends to include those persons in this action.


**V.      Name and Address of Noticing Party.**

        Our name, address and telephone number is as follows:  California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.


**VI.     Counsel.**

        CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
Law Offices of Andrew L. Packard
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel. (707) 763-7227
Fax. (707) 763-9227
Email: Andrew@PackardLawOffices.com


**VII.    Penalties.**

        Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Miguel Contreras, S. John Martinelli, and S. Martinelli & Co. to a penalty of up to $37,500 per day per violation for all violations occurring after January 12, 2009, during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

        CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Miguel Contreras, S. John Martinelli, and S. Martinelli & Co. and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those

Notice of Violation and Intent To File Suit
April 2, 2014
Page 16 of 16

discussions within the next 20 days so that they may be completed before the end of the
60-day notice period.  We do not intend to delay the filing of a complaint in federal court
if discussions are continuing when that period ends.


Sincerely,


Bill Jennings, Executive Director
California Sportfishing Protection Alliance

<u>**SERVICE LIST**</u>

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Thomas Howard, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Kenneth A. Harris, Jr., Executive Officer
Regional Water Quality Control Board
Central Coast Region
895 Aerovista Place, Suite 101
San Luis Obispo, CA 93401-7906

**ATTACHMENT A**
**Notice of Intent to File Suit, S. Martinelli & Co.**
**Significant Rain Events,\* April 2, 2009 – April 2, 2014**

| | | | |
|---|---|---|---|
| | Nov 7 2010 | Oct 3 2011 | Dec 5 2012 |
| Apr 7 2009 | Nov 19 2010 | Oct 4 2011 | Dec 12 2012 |
| May 1 2009 | Nov 20 2010 | Oct 5 2011 | Dec 15 2012 |
| Oct 13 2009 | Nov 21 2010 | Nov 5 2011 | Dec 17 2012 |
| Dec 7 2009 | Nov 23 2010 | Nov 11 2011 | Dec 22 2012 |
| Dec 11 2009 | Nov 27 2010 | Nov 19 2011 | Dec 23 2012 |
| Dec 12 2009 | Dec 5 2010 | Nov 20 2011 | Dec 25 2012 |
| Dec 13 2009 | Dec 17 2010 | Jan 20 2012 | Dec 29 2012 |
| Dec 26 2009 | Dec 18 2010 | Jan 21 2012 | Jan 5 2013 |
| Dec 27 2009 | Dec 19 2010 | Jan 22 2012 | Jan 6 2013 |
| Jan 12 2010 | Dec 25 2010 | Jan 23 2012 | Feb 19 2013 |
| Jan 13 2010 | Dec 28 2010 | Feb 13 2012 | Mar 6 2013 |
| Jan 17 2010 | Dec 29 2010 | Feb 29 2012 | Mar 7 2013 |
| Jan 18 2010 | Jan 1 2011 | Mar 1 2012 | Apr 4 2013 |
| Jan 19 2010 | Jan 2 2011 | Mar 13 2012 | Apr 7 2013 |
| Jan 20 2010 | Jan 30 2011 | Mar 14 2012 | Oct 29 2013 |
| Jan 22 2010 | Feb 16 2011 | Mar 15 2012 | Nov 19 2013 |
| Jan 26 2010 | Feb 17 2011 | Mar 16 2012 | Nov 20 2013 |
| Jan 29 2010 | Feb 18 2011 | Mar 17 2012 | Dec 7 2013 |
| Feb 4 2010 | Feb 19 2011 | Mar 24 2012 | Feb 2 2014 |
| Feb 6 2010 | Mar 13 2011 | Mar 25 2012 | Feb 6 2014 |
| Feb 9 2010 | Mar 14 2011 | Mar 27 2012 | Feb 26 2014 |
| Feb 21 2010 | Mar 15 2011 | Mar 31 2012 | Mar 6. 2014 |
| Feb 23 2010 | Mar 16 2011 | Apr 10 2012 | Mar 26, 2014 |
| Feb 26 2010 | Mar 18 2011 | Apr 12 2012 | |
| Feb 27 2010 | Mar 19 2011 | Apr 13 2012 | |
| Mar 2 2010 | Mar 20 2011 | Apr 25 2012 | |
| Mar 3 2010 | Mar 21 2011 | Apr 26 2012 | |
| Mar 10 2010 | Mar 22 2011 | Jun 2 2012 | |
| Mar 12 2010 | Mar 23 2011 | Sep 5 2012 | |
| Apr 2 2010 | Mar 24 2011 | Oct 22 2012 | |
| Apr 4 2010 | Mar 25 2011 | Nov 1 2012 | |
| Apr 11 2010 | Mar 26 2011 | Nov 8 2012 | |
| Apr 12 2010 | Apr 7 2011 | Nov 9 2012 | |
| Apr 20 2010 | May 14 2011 | Nov 16 2012 | |
| Apr 27 2010 | May 15 2011 | Nov 17 2012 | |
| Apr 28 2010 | May 16 2011 | Nov 18 2012 | |
| May 10 2010 | May 17 2011 | Nov 21 2012 | |
| Oct 17 2010 | May 25 2011 | Nov 28 2012 | |
| Oct 23 2010 | May 28 2011 | Nov 30 2012 | |
| Oct 24 2010 | Jun 4 2011 | Dec 1 2012 | |
| Oct 30 2010 | Jun 28 2011 | Dec 2 2012 | |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.